**Mark A. KRIEGER, Plaintiff,**

v.

**Warren E. GAST, et al., Defendants.**

**No. 4:99–CV–86.**

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 9, 2001.

Thomas A. Baird, Charles R. Watkins, Robert J. Emanuel, John R. Wylie, Chicago, IL, for Plaintiff.

Jon R. Muth, Grand Rapids, MI, Anne N. DePrez, Karoline W. Jackson, Indianapolis, IN, Kevin Abraham Rynbrandt, Grand Rapids, MI, Kevin J. O'Brien, Chicago, IL, for Defendants.

## OPINION AND ORDER

QUIST, District Judge.

## TABLE OF CONTENTS

I. *Facts* .................................................................766

II. *Procedural History* .................................................769

III. *Motion Standard* ...................................................770

IV. *Discussion* .........................................................770

 A. Was There A Plan? .............................................770

 B. Does Michigan Law Permit An "Entire Fairness" Challenge To A
Freeze–Out Merger? ...............................................774

 C. Did Defendants Breach Their Fiduciary Duties To Krieger And The
Class? ...........................................................778

 1. Misrepresentations ............................................779

 a. The Terms on Which the Continuing Shareholders Would
Sell Most of Their Stock to Gast ..............................779

 b. The $140 Per Share Price to be Paid by RDV Aria ...............780

 2. Omissions .................................................781

 a. The "Plan" ....................................................781

 b. Financial Statements ..........................................781

 c. The Lack of a Fairness Opinion ................................784

 d. Retention of McDonald & Co. ...................................784

 e. The Deloitte & Touche Valuation ...............................785

 f. Determination of Merger Consideration .........................785

 g. Other Omissions ...............................................786

 D. Are Krieger's Claims Barred By Gast's Articles Of Incorporation? .........786

V. *Conclusion* ..........................................................787

### OPINION

This case arises out of a merger in which Plaintiff, Mark Krieger ("Krieger"), and the class he represents were frozen out of their minority shareholder interests in Gast Manufacturing Corporation ("Gast"). Krieger claims that the amount he and the other minority shareholders were paid for their shares was far less than what those shares were actually worth and that the majority shareholders of Gast, including the directors named as defendants in this case, profited at the expense of Krieger and the minority shareholders. Krieger claims that the merger was not procedurally or substantively fair to the minority shareholders and that Defendants breached their fiduciary duties through misrepresentations or omissions in the merger notice.

Among other things, the Defendants assert that the price paid to Krieger and the minority shareholders for their shares was fair and that Krieger cannot offer any evidence of wrongdoing by Gast or its directors.

Pending before the Court are Defendants' motion for summary judgment and Krieger's motion for partial summary judgment.

## I. *Facts*

Gast, a Michigan corporation established in 1921, was engaged in the business of manufacturing and selling compressors, pumps, blowers, and related items. By 1995, Gast employed over 700 persons and had operations in both the United States and Europe with sales of almost $100 million. At that time, there were approximately 86 Gast shareholders, many of whom were either former Gast employees or descendants of former Gast employees. However, the majority of the stock was held by Defendant Warren E. Gast, his immediate family (including his son, Defendant Kevin C. Gast), his sister and her children, and three Gast directors, Allan Westmaas, William E. Johnson, and Jay Van Den Berg (referred to together with Warren E. Gast and Kevin C. Gast as the "Director Defendants"). The shares of Gast were all privately held. Therefore, there was no established market for the stock.

During 1994, Gast began to seriously investigate the possibility of an initial public offering ("IPO") of its stock. Gast's interest in an IPO was driven by two considerations. The first was the lack of liquidity, i.e., an established market, for the stock. Historically, Gast had a policy of repurchasing shares of stock for 75% of book value. (Westmaas 4/25/00 Dep. at 104–05.) However, because some of the repurchases involved substantial amounts, (*see* Johnson 11/14/00 Dep. at 119–20 (describing repurchase of Robant stock for $440,000)), and Warren Gast's family desired to liquidate part of their interest in Gast, Gast decided to explore other means of providing liquidity for its shareholders.[1] The second consideration behind a possible IPO, although less important than liquidity, was the lack of a succession plan. Warren Gast was nearing retirement age, and Kevin Gast, the only one of Warren Gast's children who had worked at or had any interest in Gast, quit his employment with Gast in 1993.[2] (Kevin Gast 11/03/00 Dep. at 62–63.)

After interviewing several investment banking firms, members of Gast's board of directors concluded that an IPO would not be appropriate for Gast given market conditions at that time.[3] However, Gast ultimately retained McDonald & Company to assist Gast in exploring alternative financing arrangements. McDonald & Company presented several alternatives for providing liquidity, including the possibility of

---

1. At the annual Gast shareholder meeting held on February 26, 1994, Warren Gast informed those in attendance that Gast may consider an IPO as a solution to the drain on the corporation's funds caused by redemption of shares. (1994 Annual Meeting Minutes at KC0000097, Westmaas Aff.App. A., attached to Defs.' Tender of Exs.)

2. Randall Damstra of McDonald & Co., the investment banker ultimately retained by Gast, testified that the lack of a succession

plan was one consideration pertinent to selecting a liquidation strategy but was not a significant factor because at that point Warren Gast was acting in an oversight capacity and a separate management team was running the day-to-day operations of the company. (Damstra Dep. at 24.)

3. Gast made this determination in or about August of 1995, around the time it made the decision to retain McDonald & Co. (8/28/95 Gast Board Minutes, Westmaas Aff.App. D.)

selling a substantial minority interest in Gast to an outside investor as part of a recapitalization (referred to as a "Private IPO"). In the Private IPO, Gast would sell a substantial minority interest to an outside investor and incur substantial bank debt that would be used to redeem some of the existing stock, thus reducing the number of outstanding shares. A Private IPO would provide the desired liquidity, allow share redemption proceeds to be taxed at capital gains rather than at ordinary tax rates, and permit the existing shareholders to maintain control of the company. Gast was receptive to the idea, and McDonald & Company introduced two potential purchasers to Gast, RDV Corporation ("RDV") and Heritage Partners. Ultimately, Gast negotiated a sale agreement with RDV.

At the February 1996 shareholders meeting, Warren Gast announced that an IPO was unlikely but that there was a possibility of a purchase of a substantial minority interest by an outside investor which would allow existing stockholders to sell part or all of their stock. (1996 Annual Shareholder Meeting Minutes at AW 0000925, Westmaas Aff.App. E.) Warren Gast also told shareholders that Gast would not repurchase shares of stock while negotiations were occurring. (*Id.*) During negotiations between Gast and RDV, the primary issue on the table was the amount that RDV would pay for its minority interest. Initially, the deal called for RDV to put in $12 million, with $8 million of that amount being allocated to common stock and $4 million being allocated to preferred stock. (Mem. of 3/25/96 from Nelson to W. Gast, Johnson, and Westmaas, Ex. 86.) Later, the amount was reduced to $10 million, split equally between common and preferred stock. (*Id.*) Finally, the amount was reduced to $8.4 million, split equally between common stock and debt. The amount RDV agreed to pay was determined by RDV's targeted internal rate of return of 30% as applied to a five-year plan prepared by Gast's Strategic Management Team. (*Id.*; Johnson Dep. at 18–19.) For its protection, RDV insisted on a provision called a "clawback", under which if certain performance targets were not met by Gast at the end of five years, RDV would acquire enough shares to obtain control of Gast. (Capital Restructuring Agreement ¶ 6(a), 3/9/01 Vogel Aff.App. A; W. Gast 10/00 Dep. at 74–76.)

At some point during negotiations, Gast and RDV agreed that the shares of all shareholders other than directors and members of the immediate families of Warren Gast and his sister, i.e., the minority, would be cashed out.[4] Thus, the minority shareholders would not be included in the Private IPO. As finally structured, the recapitalization consisted of the following components: (1) a merger between a new corporation known as Gast Investment Corporation ("GIC"), owned by the Gast majority shareholders, and Gast, in connection with which the minority shareholders' interests would be redeemed by Gast for $140 per share, leaving the majority shareholders with 100% of the stock of Gast (the "Merger"); (2) a multi-million dollar bank loan to Gast; (3) a redemption of 356,304 of the majority shareholders' common shares (Class A and Class B) for $140 per share, leaving the majority shareholders with 30,770 shares of common stock (100% ownership of Gast); (4) a $4.2 million loan by RDV Capital Management L.P. (an affiliate of RDV) to Gast; and (5) a purchase of 30,000 shares of Gast com-

---

4. There is some conflict in the evidence with regard to the issue of who first suggested that the minority shareholders be eliminated from the company. However, that issue is not material to the Court's resolution of the instant motions.

mon stock from treasury (slightly over 49%) by RDV Aria for $4.2 million, or $140 per share.[5] The $140 per share price paid for the redeemed shares and used to value the shares purchased by RDV was determined through negotiations between Gast and RDV. (Damstra Dep. at 181–82; Westmaas 4/25/00 Dep. at 20.)

On August 21, 1996, a special meeting of Gast shareholders was held for the purpose of voting on the Merger. Prior to the meeting, a notice ("Notice") signed by Warren Gast and approved by the Gast board of directors was sent to Gast shareholders informing them of the details of the Merger. The Notice, drafted by Gast's counsel, included a copy of the agreement and plan of merger between Gast and GIC and informed the shareholders that GIC would vote its shares in favor of the Merger and that the minority shareholders would receive cash in the amounts noted above for their shares.[6] The Notice also contained a copy of the dissenters' rights statute under the Michigan Business Corporation Act ("MIBCA") and described the details of the recapitalization. The Merger was approved at the August 21 meeting following a shareholder vote. Krieger, who at the time owned 500 shares of Gast common stock, attended the meeting and voted against the Merger. However, Krieger did not exercise his right to an appraisal. Following the Merger, the other recapitalization transactions occurred as described in the Notice.

In May of 1997, John Meilner of McDonald & Company received some financial information from Gast in connection with certain compensation issues and discovered that Gast was out performing projections used in connection with the 1996 recapitalization. (Meilner Dep. at 67–68.) Based upon that information, Meilner believed that a client of his, IDEX Corporation, might be interested in acquiring a company such as Gast. (Id. at 70.) Meilner contacted IDEX and described a company such as Gast without specifically mentioning Gast, and IDEX confirmed that it would be interested. (Id. at 70, 76.) Based upon statements by IDEX during that conversation, Meilner determined that the purchase price could be up to $130 million. (Id. at 75–76.) Meilner contacted Warren Gast about IDEX's interest, and an introductory meeting between IDEX and Gast was held later that month. (Id. at 141.) In late August or early September of 1997, IDEX submitted a letter of intent to Gast. Gast accepted the offer, and in January of 1998, IDEX purchased Gast for approximately $118 million. (Metcalf Dep. at 25.) Thus, those shareholders who continued to own an interest in Gast after the 1996 recapitalization realized an additional $43 million, net of debt, expenses, and a closing escrow.[7] (Grindel Aff. Ex. 1,

5. All preferred stock was also redeemed at its face value of $10 per share plus accrued interest. The total amount paid to all shareholders for preferred stock ($487,800) was relatively small compared to the total amount paid to all shareholders for common stock ($61,764,640). (Ex. 313.)

6. The Notice actually indicated that each Gast share of common stock not owned by GIC immediately prior to the Merger would be redeemed. (Notice at 1, Am. Class Action Compl. Ex. A.) Prior to the Merger, all of the majority shareholders had transferred their Gast stock to GIC.

7. The precise amount distributed to the continuing Gast shareholders (other than RDV) is not clear from the parties' briefs. Krieger states, without citing any evidence, that Defendants' 51% of post-Merger Gast netted them "an additional payment of some $59 million to them, $47 million net, over and above the redemption proceeds," (Pl.'s Br. Opp'n at 18), while the Director Defendants, citing to a funds flow memorandum from the IDEX closing, contend that the amount paid to all shareholders, net of debt, expenses, and an $11.8 million contingency reserve, was $85.7 million, (Director Defs.' Br. Supp. at

attached to Def. Gast Manufacturing Corporation's Joinder.)

## II. *Procedural History*

Krieger filed this action on July 2, 1999, alleging state law claims for breach of fiduciary duty; aiding and abetting/inducement and conspiracy to commit a breach of fiduciary duty; common law fraud; negligent misrepresentation; conspiracy; and unjust enrichment against Gast, the Director Defendants, McDonald & Company Securities, Inc., and McDonald & Company Investments, Inc.[8] The centerpiece of Krieger's claims was the so-called "Wrongful Plan", by which, Krieger alleged, Defendants sought to appropriate part of the value of the minority shareholders' interest in Gast by squeezing them out at an unfairly low price and realizing the gain through a subsequent IPO or sale of Gast. Soon after the case was filed, Defendants filed a motion to dismiss. On January 21, 2000, the Court issued an Opinion and Order granting the motion in part and denying it in part. The Order dismissed the McDonald companies as defendants in this case and dismissed the negligent misrepresentation claim against Gast and all Director Defendants except Warren Gast.

Shortly after the Court issued the January 21, 2000, Opinion and Order, the parties requested that the Court rule on certain legal issues they believed to be central to the case. Specifically, those issues were: (1) whether Michigan's appraisal statute is applicable in this case; (2) if the statute is applicable, whether appraisal is the exclusive remedy or whether Krieger's claims fell within the exception under that statute for "unlawful or fraudulent" conduct; and (3) whether Krieger has the burden of proving fraud or unlawfulness or whether Defendants have the burden of proving the "entire fairness" of the transaction. On August 18, 2000, the Court issued an Opinion and Order (the "Issues Opinion") in which it held that Krieger's claims were subject to the appraisal statute but that his claims fell within the exception for action that is "unlawful or fraudulent". The Court also concluded that Krieger has the burden of proving that Defendants failed to disclose information in the Notice that was material to his decision whether to exercise his appraisal rights. In considering the scope of the exclusivity provision, the Court observed, after reviewing decisions from Delaware and other states, that the scope of the appraisal remedy under Delaware law does not significantly differ from that of other states because most states, like Delaware, recognize an exception to the exclusivity of the appraisal remedy for fraudulent or unlawful action. The Court distinguished Krieger's claims from those in other cases which courts found to present a mere disagreement as to price subject to the appraisal remedy on the basis that Krieger's allegations are not simply that the price Krieger and the minority shareholders received was too low, but that Defendants failed to disclose information in the Notice which was material to the decision whether to seek an appraisal.

16). Dividing the total amount received in the Merger/recapitalization and the IDEX deal ($156 million) by the total number of pre-Merger Gast shares, Krieger calculates the per share price for *all* Gast shares at $328. (Pl.'s Br. Opp'n at 19.)

8. Prior to filing this case, Krieger filed suit in the Northern District of Illinois and in Illinois state court. The Northern District of Illinois dismissed Krieger's federal securities claim on the merits and dismissed Krieger's state law claims pursuant to 28 U.S.C. § 1367(c). Krieger refiled his state law claims in Illinois state court, which dismissed the complaint for lack of personal jurisdiction. Thus, this Court is the first court to consider Krieger's state law claims on the merits.

On August 22, 2000, the Court issued an Opinion and Order denying Krieger's motion for class certification. The Court concluded that class certification was inappropriate because the reliance element of Krieger's fraud claims presented an individualized inquiry which would predominate over the common class claims. In addition, the Court rejected Krieger's argument that the element of reliance did not prevent certification of Krieger's breach of fiduciary duty and unjust enrichment claims because the fraud and breach of fiduciary duty claims, which incorporated the Wrongful Plan, were the main claims in the case.

On October 10, 2000, Krieger filed a motion to amend his complaint and a renewed motion for class certification. Krieger's proposed amended complaint differed from the original complaint principally in that it deleted the fraud claims and added "fair price" and "fair dealing" claims based (most likely) upon the Court's prior references to various Delaware cases, most notably the Delaware Supreme Court's decision in *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983). Krieger asserted that the purpose of the proposed amended complaint was to clarify that he was asserting both fair price and fair dealing claims, to conform the pleadings to the Court's prior rulings, and to make the case suitable for class certification by deleting his fraud claims. The proposed amended complaint eliminated references to the "Wrongful Plan" but introduced a new concept into the case—the "second bite at the apple"—referring to a second opportunity to profit from the sale of Gast, in this case, the sale to IDEX. On January 11, 2001, the Court issued an Opinion and Order granting Krieger's motion to amend and his renewed motion for class certification.

### III. *Motion Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### IV. *Discussion*

### A. Was There A Plan?

■ The focus of Krieger's claims has changed somewhat from his initial complaint, but the overriding theme of this litigation has always been the existence of a "Plan", pursuant to which the Director Defendants sought to appropriate, for themselves and the other majority shareholders, a portion of the value of the minority shareholders' stock by paying them less than the fair value of their shares in the Merger and realizing the unpaid portion of the value of the minority shareholders' stock in a subsequent sale or disposition of Gast. (Am. Class Action Compl. ¶¶ 2, 33.) That subsequent disposition was the sale to IDEX. The Plan, originally dubbed the "Wrongful Plan", is now referred to as the "two bites of the apple strategy", but remains essentially the same. That Krieger, and, perhaps, the other minority shareholders, would assume that fraud or wrongdoing was afoot is understandable. After all, Krieger and the

Class were cashed out at $140 per share, and approximately eighteen months later, the Director Defendants and the other continuing shareholders received several times that amount when they sold their remaining Gast shares to IDEX. These circumstances are the flip side of those in another case recently before this Court:

> When publicly traded stock drops as quickly and as far as did the stock of Perrigo Company ("Perrigo"), one reasonably thinks that there is something wrong—probably fraud. In this case, Perrigo had a secondary public offering of 13 million shares at $31 per share in October 1993. In March 1994, the share price dropped from $28.25 to $22.375 over two days, and in May 1994, the price dropped suddenly again to $12.25. To date, the share price has not risen above $20 and has generally fluctuated between $10 and $15. The October 1993 offering (the "1993 Offering") was the largest offering up to that time on the National Association of Securities Dealers exchange. The corporate insiders of Perrigo and the largest shareholder of Perrigo reaped profits of tens of millions of dollars.

*Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.*, Nos. 1:95–CV–141, 1:95–CV–290, 1998 WL 513091, at *1 (W.D.Mich. June 15, 1998). However, after reviewing the evidence presented by the parties, the Court concludes that Krieger has failed to establish the existence of any plan, regardless of whether the plan is described as the "Wrongful Plan" or the "two bites at the apple strategy."

■ Defendants contend that Krieger's claim that the Director Defendants entered into a "Plan", as alleged by Krieger, must be rejected because the "Plan" makes no sense. This Court agrees. Defendants rely on *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), as support for the proposition that a defendant is entitled to summary judgment where the plaintiff's theory makes no economic sense. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356; *Eastman Kodak Co.*, 504 U.S. at 468–69, 112 S.Ct. at 2083. While these cases arose in the antitrust context, the Court finds no reason for limiting the principle for which they are cited to antitrust law.

A claim that majority shareholders paid minority shareholders less than the fair value of their stock in a cash-out merger and appropriated the excess value of the minority's stock in a subsequent sale for a higher per share price would make economic sense, even if it was alleged, as it is here, that the majority also sold a large portion of their stock at the same price but as a result owned 100% of the company. The reason is simple—the "excess value" flows to the remaining shareholders. The picture changes, however, when a third party, such as RDV, participates with the surviving shareholders because the surviving shareholders would have turned around and given away almost one-half (49%) of the excess value to the third party. It does not make economic sense for the surviving shareholders to do this, and that is the situation in this case.[9]

---

**9.** Krieger argues that the $140 per share paid by RDV cannot be equated to the $140 per share paid to Krieger and the minority shareholders because RDV brought more to the table than just $140 per share. According to Krieger, in RDV the Director Defendants re-

ceived: (1) the ability to liquidate as much of Gast as possible; (2) preferential capital gain treatment for any amounts paid; and (3) continued control of Gast. (Pl.'s Br. Opp'n at 20.) However, Krieger does not attempt to show how these components would, according to

More important, the evidence cited by Krieger does not establish that Gast stock was worth more than $140 per share at the time of the Merger or that a plan existed at the time of the Merger regarding the future disposition of Gast. Krieger cites various exhibits which he claims show that the Director Defendants were aware that the value of Gast shares was more than $140. The evidence, however, does not support Krieger's assertions. For example, Krieger contends that the Director Defendants estimated that Gast had an IPO value of roughly $100 million in 1994. Krieger cites a memorandum dated June 27, 1994 (Ex. 104), regarding a market for Gast stock, which notes that IPO's generally offer 20–30% of a company's stock; a copy of the agenda for the April 25, 1995, Gast board of directors' meeting which contains the notation "$20–30 M Issue" by Johnson (Ex. 16); and a presentation document dated September 28, 1995 (Ex. 185), prepared by MacDonald & Co. showing a valuation of $90–$100 million. These documents do not support Krieger's arguments because Johnson testified that he had no idea what his "$20–30 M Issue" notation referred to, (Johnson Dep. at 107), and there is no evidence showing that the notation had anything to do with an IPO. In addition, the McDonald & Co. document was prepared several months before RDV came into the picture, and the valuation was based upon an outright sale of Gast, which did not occur. Finally, the June 27, 1994, memorandum states that the current per share value was $88.

Krieger also cites a March 25, 1996, memorandum prepared by Nelson (Ex. 88) to support his claim that Defendants estimated their 51% post-Merger share of Gast to be worth $49 million. However,

Krieger's argument is based upon an improper characterization of the $49 million figure in that document. As Defendants point out, the $49 million represented the enterprise value, not the value of the shareholders' equity. Krieger's argument fails to realize that the $49 million must be reduced by the amount of bank debt ($36 million) incurred following the Merger, the RDV debt ($4.2 million), and subordinated debt to some of the continuing shareholders for their redeemed Gast stock ($3.5 million), leaving a net worth of only $5.3 million or approximately $88 per share. (Tubergen 6/14/00 Dep. at 90–91.)

Krieger also takes the approach that the redemption of the continuing shareholders' stock and the sale of the 49% interest to RDV was in reality a single transaction. In other words, Krieger states, "Economically the Private IPO amounts to, and was always viewed by Defendants as, a sale of 49% of the Company in exchange for the money taken out pursuant to the redemption." (Pl.'s Resp. Director Defs.' Mot. at 7.) By characterizing the redemption proceeds as payment for the 49% interest in Gast, Krieger attempts to raise the per share price received by the continuing shareholders in the recapitalization. It is clear from the transactions as described in the Notice, however, that Krieger's characterization is wrong. The Notice states that the continuing shareholders would sell most of their shares to Gast for the same $140 per share Krieger and the minority shareholders received and that RDV would purchase enough shares to obtain a 49% equity interest. Moreover, the evidence Krieger cites does not support his argument.[10]

Krieger also states that:

Krieger's own calculation, translate into more than a fifty percent discount.

10. For example, Exhibit 316 is simply an outline of the post-merger transactions prepared by Gast's counsel Vogel, which indicates the

After consulting with Deloitte & Touche on tax issues, it was decided that Defendants selling 49% of their stock for $260/share (or thereabouts), as originally planned, yielded too high a price to the minority. Thus, it was decided that the remaining Gast shareholders after the Merger would instead "sell," or have "redeemed," almost all of their stock, for a much lower per share price.

(Pl.'s Resp. Br. Defs.' Mot. at 12.) Although Krieger's statement appears to suggest that Deloitte & Touche determined that the value of Gast stock was $260 per share, it is not clear whom Krieger contends determined such a price. In any event, Krieger cites no record evidence for this statement. The Court does note that the Deloitte & Touche valuation in the record refutes Krieger's assertion that Defendants believed that the stock was worth more than $140 per share. The Deloitte & Touche valuation was obtained not by Gast for purposes of determining the Merger consideration, but rather by Warren Gast, his sister, and Westmaas to value their Gast shares in connection with charitable contributions they were planning to make. Deloitte & Touche determined that Class A non-voting shares and Class B shares were worth $136.50 per share and $137 per share, respectively. Deloitte & Touche reached those numbers by factoring in the $140 negotiated price to substantially increase its own initial fig-

ures. Because most reasonable taxpayers desire to maximize the value of charitable deductions in order to reduce income tax liability, it makes no sense that two Defendants supposedly possessing information that Gast was worth far more than $140 per share would accept a valuation of less than one-half of what Krieger contends the stock was worth, thereby giving up substantial tax benefits.

Other evidence also refutes Krieger's claim. In a memorandum dated February 23, 1996, Westmaas responded to a presentation by McDonald & Co. which arrived at a value of $260 per share by dividing the value of the company by half the number of outstanding shares. Westmaas stated, "[t]he value of an old company share is not $260. Half of the old company may be $130 per share, but the remaining half is of the new stripped down company that bears no relation to the $130 value." (Ex. 159; Westmaas 11/00 Dep. at 96; Damstra Dep. at 130–32 (stating that "the value of the company is related to the total shares outstanding. And that was the mistake in the presentation that was made in the previous document we looked at").) [11]

Krieger has also failed to present any evidence that at the time of the Merger, the Director Defendants and RDV had a plan to sell or dispose of Gast at some future time. Damstra, of McDonald & Co., testified that while he mentioned to the Director Defendants that a private

number of continuing shareholders' shares to be redeemed and the amount to be paid by RDV ($4.2 million) for 49% (30,000 shares) of Gast. Similarly, Johnson's testimony describes the background of the transactions but has nothing to do with how Defendants viewed the sale of the 49% interest to RDV. Other evidence cited pertains to theoretical transactions that never occurred. (Tubergen 6/14/00 Dep. at 104–05; Damstra Dep. at 86, 90; Ex. 158.)

11. Krieger cites the deposition testimony of Damstra, McDonald & Co.'s representative, and various exhibits to show that McDonald & Co.'s and RDV's presentations valued the shares at $260. (Damstra Dep. at 106; Ex. 158; Ex. 303.) However, these exhibits were prepared early in the negotiations between RDV and Gast and relate to proposals that were significantly different from the ultimate transaction. For example, early proposals contemplated that the minority shareholders would sell or redeem part of their shares and continue to hold an interest in Gast.

IPO had the advantage of making more money down the road in a second sale, Gast officials were not interested in that possibility because Warren Gast "[n]ever wanted to give up control." (Damstra Dep. at 216.) Damstra also noted that Warren Gast "was looking at how could he buy out RDV in five years." (*Id.*) Likewise, RDV had no immediate plans to dispose of the company. (Meilner Dep. at 65 (stating that "RDV made the investment for long-term hold purposes").) In fact, the evidence shows that the only firm exit strategy for either RDV or the continuing shareholders was the put option (and RDV's related right to buy out the continuing shareholders or force a sale) in the capital restructuring agreement. Krieger cites the deposition testimony of Kevin Gast as showing that a sale of Gast was a "foregone conclusion." (K. Gast 11/3/00 Dep. at 130.) However, an examination of this testimony shows that the "foregone conclusion" was simply his own opinion, not evidence of an agreement among the parties. (*Id.* at 131 ("In my mind it was a foregone conclusion. It was just a matter of time. I hoped that it wouldn't be that, obviously").) Similarly, Gast's counsel's testimony regarding RDV's and the continuing shareholders' plans down the road does not lead to a reasonable conclusion that the Director Defendants and Gast had conceived a specific plan for disposing of Gast. (Vogel Dep. at 178, 180 (referring to "discussions of IPOs down the road" or "discussions of some end game in terms of the investment").) Even if the parties engaged in discussions about a possible sale or IPO down the road, such discussions do not amount to a plan because the possibility of a sale or IPO at some time in the future was nothing more than speculation.[12]

## B. Does Michigan Law Permit An "Entire Fairness" Challenge To A Freeze–Out Merger?

■ Consistent with the Court's rulings in the Issues Opinion, Defendants, in their motion for summary judgment, and Krieger in his motion for partial summary judgment, have focused their arguments on whether the Director Defendants violated their fiduciary duties to Krieger by failing to disclose information in the Notice that a reasonable shareholder would consider material in deciding whether to seek an appraisal. Krieger's brief in response to the Director Defendants' motion for summary judgment raises an issue not previously addressed by the Court. The parties' briefs with regard to that motion are, in a cliché, like ships passing in the night. The Director Defendants contend that they are entitled to summary judgment because, among other reasons, the Notice contained all the information required by the MIBCA or material to the decision whether to seek appraisal, while Krieger argues that Defendants are not entitled to summary judgment because Defendants' motion does not address the "entire fairness" of the Merger, i.e., fair price and fair dealing—the first two Counts in Krieger's amended complaint. Thus, aside from the adequacy of disclosures in the Notice, the Court must also address this issue: whether Michigan courts would permit the same type of "entire fairness" challenge to a freeze-out merger outside of an appraisal proceeding as permitted under Delaware law.

12. Krieger also suggests that a plan can be shown because the Director Defendants provided dissenters' rights to the minority shareholders, which under the Michigan Business Corporation Act limit a shareholder's right to sue. The Court rejects the argument because the Director Defendants were merely following permissible procedures under the MIBCA. The act of providing dissenters' rights bears no relationship to the existence of a plan.

Krieger's entire fairness challenge to the Merger is based upon the Delaware Supreme Court's opinion in *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), which this Court discussed in some detail in the Issues Opinion. *Weinberger* is the most significant opinion issued by the Delaware Supreme Court in recent years dealing with the treatment of minority shareholders in freeze-out mergers. In that case, the court held that under Delaware law, cashed-out minority shareholders should generally be required to use the liberalized appraisal process adopted in that case to obtain the fair value of their shares. *See id.* at 712–15. However, the court also observed that the appraisal remedy may be inadequate where "fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved," thus allowing a court to grant equitable relief, including monetary damages. *See id.* at 714. Moreover, the court held that where corporate directors stand on both sides of a transaction, they have the burden of demonstrating the "entire fairness" of the transaction, which has two aspects: fair dealing (or procedural fairness) and fair price. *See id.* at 710–11. The fair dealing prong "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained." *Id.* at 711. Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Finally, *Weinberger* sanctioned the use of cash-out mergers as a means of eliminating minority interests, thus overruling the rule announced only a few years earlier in *Singer v. Magnavox Co.*, 380 A.2d 969, 980 (Del.1977), that the use of mergers for that purpose constituted a breach of the majority shareholder's fiduciary duty. *See Weinberger*, 457 A.2d at 715.

■ This Court did not consider in the Issues Opinion whether Michigan courts would permit minority shareholders to raise an entire fairness challenge to a cash-out merger because the main issue before the Court was whether Krieger's claims were subject to the exclusivity provision of the appraisal statute and Krieger had not alleged fair price and fair dealing claims at that time. The Court concluded that Krieger's claims were not barred by the exclusivity provision of the appraisal statute but that Krieger had the burden of proof on his claims of fraud and breach of fiduciary duty. *Krieger v. Gast*, 122 F.Supp.2d 836, 851 (W.D.Mich.2000)("The Court's conclusion that § 1545a does not apply in this case does not automatically mean that Defendants are required to prove the 'entire fairness' of the transaction"). However, now the question of whether Michigan courts would permit minority shareholders to raise an entire fairness challenge to a cash-out merger is squarely before this Court. As a federal court sitting in diversity, this Court must apply the forum state's law in accordance with decisions from the state's supreme court. *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir.2001). Where the state's supreme court has not spoken on the issue, a federal court may consider "all relevant data," including decisions from appellate and trial courts, "positions expressed in restatement of law, law review commentaries, and decisions from other jurisdictions or the 'majority' rule." *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). Because no Michigan court has spoken on this issue, the Court looks to other permissible sources of "relevant data."

The appraisal remedy was first introduced around the end of the nineteenth century as a means of facilitating mergers or combinations to provide large pools of capital to businesses such as the railroad industry. *See generally,* Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law,* 84 Geo. L.J. 1, 11 (1995). Under the early incorporation statutes, corporations could not merge or consolidate with another corporation without unanimous approval of their stockholders. This unanimous requirement gave a single shareholder the power to block corporate changes and, thus, was considered an impediment to economic progress. *Id.* at 11–13. Courts intervened by fashioning exceptions to the unanimous approval rule, for example, in transactions involving a cash sale of all assets. *See* Barry M. Wertheimer, *The Purpose Of The Shareholders' Appraisal Remedy,* 65 Tenn. L.R. 661, 665–66 (1998). Eventually, corporation laws were changed to permit mergers and other corporate transactions upon majority approval. Provisions allowing minority shareholders to dissent and receive the appraised fair value of their shares were also commonly adopted, although generally not in tandem with the statutes permitting corporate action on less than unanimous approval. Alexander Khutorsky, Note, *Coming In From The Cold: Reforming Shareholders' Appraisal Rights In Freeze–Out Transactions,* 1997 Colum. Bus. L.Rev. 133, 138–40 (1997). The purposes of the appraisal remedy were generally understood to compensate minority shareholders for the loss of their right to veto fundamental corporate transactions and provide minority shareholders liquidity, or "a way out," as an alternative to remaining in an investment that was substantially altered from the original investment. Wertheimer, 65 Tenn. L.R. at 667. Despite its availability, appraisal was seldom used, either because

transactions were structured to avoid the availability of appraisal rights or because fiduciary duty doctrine imposed limits on the use of corporate transactions to cash-out minority shareholders. Thompson, 84 Geo. L.J. at 17–19. However, as legislatures and courts expanded the scope of majority shareholders' power to eliminate minority shareholders through means such as freeze-out mergers, the appraisal remedy took on a new focus.

> Instead of being forced to remain in merged entities not of their choosing, shareholders were now losing their ownership interests at a time not of their choosing. Liquidity was no longer the problem. Instead, the focus had shifted to an unwanted termination of the ownership interest of minority shareholders at a price chosen by the controlling shareholders—the parties who were doing the terminating.

Wertheimer, 65 Tenn. L.Rev. at 677–78.

The *Weinberger* court revamped the appraisal remedy, making it more appropriate for its modern day usage in minority freeze-out cases by expanding the scope of appraisal and, thus, more favorable to minority shareholders. The court also designated the appraisal remedy as the basic check on majority opportunism by holding that appraisal should be a minority shareholder's exclusive remedy in most cases. Nonetheless, the court provided for continued judicial scrutiny of majority action by requiring directors or majority shareholders to demonstrate the entire fairness of the transaction in cases where fraud, self-dealing, or similar conduct is alleged.

In the aftermath of *Weinberger,* Delaware courts have permitted cashed-out minority shareholders to challenge the "entire fairness" of a merger outside of an appraisal proceeding under the rubric of fair dealing and fair price, even in the face of allegations that the alleged harm could

be remedied in an appraisal. *See, e.g., Ince & Co. v. Silgan Corp.,* No. 10941, 1991 WL 17171 (Del.Ch. Feb. 7, 1991); *Seagraves v. Urstadt Prop. Co.,* No. 10307, 1989 WL 137918 (Del.Ch. Nov. 13, 1989). However, in many states other than Delaware, the apparent trend is to view appraisal as the sole check on conflicts of interest by majority shareholders. Wertheimer, 65 Tenn. L.Rev. at 689 (stating that "[t]he primary role of the appraisal remedy today, as evidenced by the preponderance of the case law, is to monitor and deter self-dealing acquisition transactions and provide minority shareholders a remedy in the event of such transactions"). One scholar has noted:

> There has been a strong countermovement toward using appraisal to check apparent conflicts of interests by majority shareholders. Courts in twelve states have held appraisal to be exclusive, many with an overly optimistic view of what appraisal can do to protect the interests of minority shareholders.

> This headlong rush toward appraisal in these non-Delaware cases contrasts starkly with Delaware's reluctance to embrace the remedy so unconditionally. . . .

Thompson, 84 Geo. L.J. at 24. Some courts rationalize this result by treating the dispute solely about price, thus rendering appraisal the proper remedy. *See* F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Oppression Of Minority Shareholders* § 5.33 (2d ed.1985). One such case is *Stringer v. Car Data Systems, Inc.,* 314 Or. 576, 841 P.2d 1183 (1992)(en banc), which this Court discussed in the Issues Opinion. There the plaintiff minority shareholders alleged that the defendants breached their duties of loyalty, good faith, fair dealing, and full disclosure by paying an amount that was unreasonably low in a cash-out merger. *See Stringer,* 314 Or. at

585–88, 841 P.2d at 1188–89. The majority of the Oregon Supreme Court held that the plaintiff's allegations established only a disagreement over the price they received for their stock, for which appraisal was the sole remedy.

■ Without the benefit of any guidance from Michigan courts on the issue, this Court predicts that Michigan courts would not adopt the entire fairness test used by Delaware courts as a remedy in addition to statutory appraisal. Instead, this Court believes that Michigan courts, like other jurisdictions outside of Delaware, would hold that appraisal is the sole remedy available to a minority shareholder, even in a conflict transaction, so long as the shareholder's complaint is that he was paid less than the fair value of his shares. *See Werner v. Alexander,* 130 N.C.App. 435, 440, 502 S.E.2d 897, 901. The "entire fairness" test is at odds with this approach because it encompasses concepts of fair price and procedural fairness (including fairness of the valuation procedures), both of which relate to the value of the minority shareholder's stock—the issue at the heart of an appraisal proceeding. *See Offenbecher v. Baron Servs., Inc.,* 2001 WL 527522, at *9, —— So.2d ——, —— (2001)(Murdock, J., dissenting)(stating that the "right to receive the 'fair value' of one's shareholder interest provides a remedy for actual or threatened oppression of minority shareholders"). Other data which the Court finds "relevant" to its decision are changes made to the commentary to the Model Business Corporation Act in connection with 1999 revisions to the Model Act. As noted in the Issues Opinion, the comment to the 1984 version of the Model Act, adopted by Michigan in 1989, cited *Weinberger* as support for the statement that the appraisal remedy may not be adequate if fraud, misrepresentation, self dealing, deliberate waste of corporate assets or gross or palpable overreaching are involved. The commentary

to the 1999 version further restricts the circumstances in which appraisal may not be appropriate, which include: (1) serious procedural defects in approving the corporate action; or (2) fraud or misrepresentation affecting the shareholder vote. Model Bus. Corp. Act § 13.02, Official Comment 5. In addition, the commentary deletes the prior reference to *Weinberger*, indicating a further shift toward exclusivity and rejection of an "entire fairness" inquiry. It should be noted, however, that the 1999 version of the Model Act also contains revisions to the valuation provision which should make the appraisal process more favorable to minority shareholders in a cash-out situation. Although Michigan has not adopted the 1999 version of the Model Act, the Court finds the changes to the commentary to be some indication of the evolving role of appraisal in cash-out merger settings.[13] In addition, the Court notes that the application of the "entire fairness" test has been restricted even in Delaware. In *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242 (2001), the Delaware Supreme Court held that "entire fairness" is not a requirement in short-form mergers because the short-form merger statute contains a summary procedure that is inconsistent with any reasonable notion of fair dealing. *Id.* at 247–48. Although *Glassman* is not specifically applicable here, it demonstrates the Delaware Supreme Court's recognition that appraisal should be a sufficient device for ensuring that minority shareholders, at least in some instances, receive fair value.

Therefore, the Court holds that Krieger may not maintain an "entire fairness" claim under Michigan law.[14] However, this conclusion does not undermine the Court's previous determination that Krieger may maintain a breach of fiduciary duty claim if he can show that Defendants failed to disclose information that a reasonable shareholder would have considered material to the decision whether to seek an appraisal. *See* Thompson, 84 Geo. L.Rev. at 43 (stating that exceptions to exclusivity for "illegality or fraud . . . clearly preserve a shareholder's action for a direct misrepresentation that leads to failure to exercise appraisal rights").

## C. Did Defendants Breach Their Fiduciary Duties To Krieger And The Class?

Krieger contends that he and the class are entitled to summary judgment on the

13. In the same vein, the Court does not believe that the reference to *Weinberger* in the commentary to the 1984 version of the Model Act is evidence that states that have adopted that version of the Model Act would adopt Delaware's "entire fairness" approach to evaluating the fairness of freeze out mergers. In *Pittsburgh Terminal Corp. v. Baltimore and Ohio Railroad*, 875 F.2d 549 (6th Cir.1989), the Sixth Circuit rejected the plaintiff's argument that Maryland law tests the fairness of a transaction through considerations of "fair price" and "fair dealing." The court stated, "no Maryland court has expressly adopted the *Weinberger* approach, despite Pittsburgh Terminal's contention to the contrary." *Id.* at 554. One of the cases apparently cited by Pittsburgh Terminal in support of its argument was *Walter J. Schloss Associates v. Chesapeake and Ohio Railway Co.*, 73 Md.App. 727, 536 A.2d 147 (1988), in which the Maryland Court of Appeals cited *Weinberger* and stated that "there does not seem to be a great deal of difference between established Maryland law and the principles enunciated in *Weinberger.*" Because no Michigan Court has even cited *Weinberger*, there is an even stronger basis in this case for rejecting the application of the "entire fairness" test.

14. Even if the Court determined that Michigan courts would allow an entire fairness challenge, the Court would conclude that the Merger met both the fair dealing and fair price prongs of that test. As set forth above, the evidence shows that the Merger consideration was fair and that Defendants did not time or structure the Merger to deprive the minority shareholders of the opportunity to participate in the sale to IDEX.

issue of whether the Director Defendants breached their fiduciary duties based upon certain omissions in the Notice. In particular, Krieger argues that the Director Defendants breached their fiduciary duties by omitting from the Notice: (1) financial information; (2) the basis upon which the merger consideration was determined; (3) the fact that Gast had retained McDonald & Co. as its investment banker; and (4) the fact that Gast never obtained a fairness opinion in connection with the Merger.

The Director Defendants contend that they are entitled to summary judgment because Krieger cannot establish that a material misrepresentation was made in the Notice or that the Notice omitted material information. In particular, the Director Defendants claim that the Notice did not misrepresent the continuing shareholders' intent to sell most of their Gast shares for $140 and retain the balance of their Gast shares or the fact that RDV was purchasing 30,000 shares for $4.2 million ($140 per share) and making a $4.2 million loan to Gast in connection with the recapitalization. In addition, the Director Defendants assert that the Notice did not omit material facts as Krieger contends because there is no evidence of a "Plan" and because disclosure of other information was either not required or was not material.

■ With regard to materiality, the parties agree, as does the Court, that the test adopted by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), under the federal securities laws is an appropriate test of materiality in this case. Under that test, a statement or omission is material if there is a substantial likelihood that the statement or omission would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2132.

### 1. Misrepresentations

### a. The Terms on Which the Continuing Shareholders Would Sell Most of Their Stock to Gast

Krieger alleges that the statement in the Notice that the continuing shareholders intended to sell most of their stock to Gast for $140 per share—the same price to be paid for the minority shareholders' shares—was misleading because

> [t]he similarity in apparent terms on which the Inside Group would sell its stock and the minority would sell theirs, however, was not real, and failed to explain the truth, which was that the defendants were receiving *in addition to the $140*, a valuable proportional share in the continuing Gast, which the squeezed-out minority was not allowed to receive.

(Am. Class Action Compl. ¶ 42A.) Krieger argues that this statement was misleading because what the continuing shareholders really received was $140 per share plus 51% of the ownership of Gast (after the sale of the 49% interest to RDV).

The Court rejects Krieger's argument because the evidence shows that the continuing shareholders did not receive $140 per share in addition to a proportional interest in Gast; rather, the continuing shareholders sold a large percentage of their stock for $140 per share but retained sole ownership of the company (prior to the sale to RDV) because they did not sell all of their stock and the minority shareholders were eliminated as a result of the Merger. The Notice was very clear on this point:

> The Merger will have the effect of leaving the GIC Shareholders as the sole shareholders of the Company after

the merger, owning the same number of shares of Company Class A Common Stock, Company Class B Common Stock and Company Preferred Stock, as they owned in the Company before the formation of GIC....

. . . . .

After the Merger, the Continuing Shareholders of the shares of Company Common Stock in the aggregate intend to sell to the Company for cash at $140 per share approximately 325,533 shares of Company Common Stock, for a total price of approximately $45,574,620, leaving them with approximately 61,743 shares of Company Common Stock....

(Notice at 6, 12.) Thus, the Notice accurately described the sale of the continuing shareholders' stock and their retention of a 100% interest in Gast following the Merger. That percentage was reduced to 51% after RDV purchased its 49% interest in Gast. Consideration of the details of the transaction as they actually occurred exposes the fallacy of Krieger's claim that the $140 per share paid to the continuing shareholders was low (thus making the $140 per share paid to the minority low) because the continuing shareholders sold most of their stock but retained a 51% in Gast after the recapitalization. According to Krieger's theory, if the continuing shareholders had only sold a 25% interest in post-merger Gast and retained a 75% interest, the $140 per share price would be even lower. However, this is merely playing games with numbers.

What Krieger is really arguing is that the statement that the Director Defendants and other continuing shareholders would also receive $140 for their shares was misleading because the value of the stock they continued to hold was worth more than $140 per share, thus depriving Krieger and the minority shareholders of a portion of the value of their stock. This argument is entirely dependant upon Krieger's allegation that Defendants failed to disclose the existence of a "Plan" to enhance the value of their shares at the expense of the minority, which is discussed separately below.

### b. The $140 Per Share Price to be Paid by RDV Aria

■ Krieger also alleges that the Notice was misleading with respect to the 49% interest purchased by RDV Aria because "while this transaction was structured to look as if RDV paid $4.2 million for 30,000 shares, *i.e.*, $140/share, in reality, the $4.2 million loan was treated as equity and the real purchase price was $280/share." (Am. Class Action Compl. ¶ 42C.) Krieger contends that this allegation is supported by evidence showing that Defendants and RDV viewed the $8.4 million of debt and equity as the purchase price of the stock, resulting in a value of $280 per share.

Krieger cites a document prepared in 1997, several months after RDV Aria purchased the Gast stock, in connection with a proposed Gast executive stock purchase program. The document contains a proposal for offering Gast shares to select management personnel using two valuation methods yielding share prices of $400 and $398 per share. (Ex. 108.) The second valuation approach uses a "[m]ost recent per share price" of $280. The $280 per share price refers to RDV Aria's purchase of the 49% interest, equating the $4.2 million equity investment and the $4.2 million loan as a total purchase price of $8.4 million ($280/share). In addition, Krieger points to the fact that RDV calculated its desired rate of return using both the loan and the equity. (Tubergen 6/14/00 Dep. at 124–26, 132.) Krieger contends that because RDV calculated its internal rate of return on its investment in Gast based

upon both debt and equity, RDV considered the debt as equity.[15]

Krieger's evidence does not support his claim that the $4.2 million RDV debt was actually equity. Krieger's strongest evidence in support of this claim is the undated 1997 document regarding the proposed executive stock purchase plan which lumps the debt and equity together as the purchase price for the stock. The author of the document is unknown. (W. Gast 10/20/00 Dep. at 209–10; Westmaas 4/25/00 Dep. at 137–42; Tubergen 6/14/00 Dep. at 142.) Krieger asserts, however, that the identity of the author is immaterial because the document came from Defendants' files. While that is true, Warren Gast testified that he did not know who prepared the document, and he could not understand or disagreed with the statement that RDV paid $280 per share for its equity interest. (Warren Gast 10/20/00 Dep. at 210–11.) Without any indication of who within Gast prepared the document and the basis for the author's characterization of the debt as part of RDV's equity purchase price, the document provides no basis for concluding that the RDV debt was actually equity.

Likewise, the fact that RDV calculated its internal rate of return upon both the debt and equity investment components does not establish that the debt was actually equity. The internal rate of return calculation was performed to determine the structure of the clawback agreement, i.e., to determine the performance benchmark for the put and call options in connection with the clawback. Moreover, De-

fendants have presented evidence showing that all parties treated the debt for what it was—debt. In particular, the Funds Flow Memorandum from the closing on the merger with IDEX shows that the debt paid out of the merger consideration included $4,224,164.38 to RDV Capital Management, L.P., for principal and accrued interest on the RDV loan to Gast. (Grindel Aff. Ex. 1.) Krieger has not shown that RDV received any return on the loan other than interest. Therefore, the Notice accurately described the $4.2 million loan as debt.

## 2. Omissions

### a. The "Plan"

As discussed above in Section IV.A., Krieger has failed to present evidence establishing the existence of a plan as alleged in his amended complaint. Therefore, the Notice did not improperly omit the existence of the alleged plan.

### b. Financial Statements

■ Krieger and the Director Defendants move for summary judgment on the issue of whether the failure to include financial statements in the Notice was a material omission. The Director Defendants argue that they are entitled to summary judgment because the MIBCA does not require disclosure of financial information until after a shareholder dissents. Part of the dispute focuses upon whether the Court held in the Issues Opinion that financial information was material and had to be disclosed in the Notice. The Court

---

**15.** Another piece of evidence cited by Krieger is a memo from Westmaas to Gast's attorney, Nelson Vogel, dated June 17, 1997, in which Westmaas summarized an earlier conversation with Vogel. The memo apparently dealt with the concern of how a $400 per share price would be perceived by the minority shareholders who were bought out at $140 per share. The Court does not consider this document because it was not included among the exhibits submitted either by Krieger or Defendants. Even if the document were before the Court, it would not support Krieger's assertion that the RDV debt was actually equity.

notes that some statements in the Issues Opinion and references to Delaware law could be read as supporting Krieger's argument that financial statements had to be included in the Notice. *See Krieger,* 122 F.Supp.2d at 849–50. However, the issues before the Court were whether Krieger's claim was barred by the exclusivity provision of the appraisal statute and, if not, who had the burden of proof. The Court concluded that Krieger's claims were not barred by the exclusivity provision because he alleged misstatements and omissions in the Notice which dissuaded him from exercising his appraisal rights, and those claims were not simply a dispute over price. Thus, the Court was not presented with the issues now raised by Defendants, and the issue of whether financial statements were required to be included in the Notice remains open.

The Director Defendants argue that they did not violate their fiduciary duties by failing to disclose financial information in the Notice. The Director Defendants note that pursuant to §§ 703a and 769 of the MIBCA, financial information need not be provided to a shareholder until after the shareholder dissents. Section 703a specifies the information that must be included in a notice to shareholders of a meeting for approval of a merger or share exchange. Specifically, § 703a(2)(c) states:

(c) Notice of the shareholder meeting shall be given to each shareholder of record, whether or not entitled to vote at the meeting, within the time and in the manner provided in this act for the giving of notice of meetings of shareholders. The notice shall include or be accompanied by all of the following:

(i) A copy or summary of the plan of merger or share exchange. If a summary of the plan is given, the notice shall state that a copy of the plan is available upon request.

(ii) A statement informing shareholders who, under section 762, are entitled to dissent, that they have the right to dissent and to be paid the fair value of their shares by complying with the procedures set forth in sections 764 to 774.

M.C.L. § 450.1703a(2)(c)(footnote omitted). In addition, § 764 provides that if dissenters' rights are available to shareholders, the notice must include a copy of the MIBCA sections governing dissenters' rights. M.C.L. § 450.1764(1).

The MIBCA does not require a corporation to furnish financial information to a shareholder until after the shareholder tenders his shares and demands payment. M.C.L. § 450.1769. There is no dispute that the Notice complied with §§ 703a and 764. The Director Defendants contend that because the MIBCA does not require financial statements to be furnished to shareholders until after they dissent, requiring financial statements to be furnished along with the Notice would render unnecessary the language requiring disclosure of financial information after a shareholder dissents. Defendants also contend that Delaware law is not applicable to the determination of when disclosure of financial information is required because Michigan's statute is different from Delaware's statute in that Delaware's General Corporation Law does not contain a provision such as § 769 of the MIBCA indicating when financial statements must be disclosed.

Krieger contends that § 769 is not a "safe harbor" from liability for failure to disclose material information because the Director Defendants' fiduciary duties to the minority shareholders are not limited by statute. In other words, Krieger contends that regardless of statutory requirements, the Director Defendants had a fiduciary obligation to disclose to the minority shareholders all information, including fi-

nancial statements, that would be material to the decision whether to seek appraisal—a decision that must be made at or before the time the merger is approved. In addition, Krieger contends that the Director Defendants' analysis is flawed because the requirement that certain information must be disclosed if a shareholder dissents does not automatically mean that directors need not disclose that information prior to that time if there is a fiduciary obligation to do so.

An established rule of statutory construction under Michigan law is that statutes in *pari materia*, or those which relate to the same subject or thing, should be read be read together. *City of Detroit v. Mich. Bell Tel. Co.*, 374 Mich. 543, 558, 132 N.W.2d 660, 667 (1965). Furthermore, "[i]n construing statutes, the court should avoid any construction that would render a statute, or any part of it, surplusage or nugatory." *Jones v. Slick*, 242 Mich.App. 715, 719, 619 N.W.2d 733, 735 (2000). Applying these rules to §§ 703a, 764, and 769 of the MIBCA, the Court concludes that the MIBCA did not require disclosure of financial statements as part of the Notice. Those statutes make clear that financial statements need be disclosed only after a shareholder dissents in accordance with the procedures specified in the MIBCA. Any interpretation to the contrary would render § 769 surplusage because having disclosed financial statements in the notice of merger, there would be no reason to require a company to furnish the same information again.[16]

In spite of the Court's conclusion that Gast was not required by statute to disclose financial statements in the Notice, the issue remains whether the Director Defendants' common law fiduciary duties trump the statutory requirements. Stated differently, did Gast still have a fiduciary duty to disclose financial statements? Krieger contends that it did, citing *Arnold v. Society for Savings Bancorp, Inc.*, 678 A.2d 533 (Del.1996), in which the court stated:

> The corporate defendants, however, complied with all of the express statutory requirements for the merger. The merger statutes do not explicitly require the company to inform stockholders of all material facts. The duty of disclosure is a judicially imposed fiduciary duty which applies as a corollary to the statutory requirements.

*Id.* at 536–37 (footnotes omitted). *Cf. Coggins v. New England Patriots Football Club, Inc.*, 397 Mass. 525, 533, 492 N.E.2d 1112, 1117–18 (1986)("A showing of compliance with statutory procedures is an insufficient substitute for the inquiry of the courts when a minority stockholder claims that the corporate action 'will be or is illegal or fraudulent as to him.' "). In contrast, in *Ince & Co. v. Silgan Corp.*, No. 10941, 1991 WL 17171 (Del.Ch. Feb.7, 1991), the plaintiffs alleged that the defendants breached their fiduciary duties by timing the merger to give the plaintiffs insufficient time to evaluate the corporation's recent financial performance. The court concluded that the plaintiffs failed to state a claim because the defendants sent the merger documents to the plaintiffs more than twenty days in advance as required by the Delaware statute. *Id.* at *4. Thus, compliance with the specific requirements of the statute defeated the claim.

While the Court agrees that in some situations a director's compliance with

---

16. Krieger contends that requiring the disclosure of financial statements in a merger notice would not render § 769 surplusage because there may be other situations where dissent is available but financial statements are not necessary to the decision to dissent. However, Krieger does not give any examples of such circumstances.

statutory requirements may be insufficient to relieve the director from liability for breach of fiduciary duties, in this case there is a specific statute governing the timing and procedure for disclosure of the information at issue, as in *Ince*. In other words, if § 769 did not contain a requirement for disclosure of financial statements, the Court might conclude that financial information should have been disclosed along with the Notice. However, this Court cannot ignore the Michigan legislature's decision on this issue. In this regard, Delaware cases are not helpful because Delaware's statutes do not specifically address disclosure of financial statements. While it is true, as Krieger notes, that the Court's conclusion means that a shareholder must decide whether or not to dissent without the benefit of financial information, a shareholder who seeks to dissent need only vote against the transaction and deliver notice to the corporation before the date of the vote.[17] M.C.L. § 450.1767(1). The shareholder is not required to make the decision to seek appraisal until after he receives all of the information specified in § 769. *See* M.C.L. §§ 450.1772–73.

Krieger also argues that § 769 does not apply to this case because the Court has already held that Krieger's claims are not subject to appraisal. However, Krieger ignores the true basis of his own claim, which is that the Notice failed to disclose information, including financial statements, that would be material to his decision to seek an appraisal. Because disclosure of financial information is not required until the shareholder dissents, § 769 is relevant to the question of whether Defendants should have provided financial information

to Krieger before he made his decision not to dissent.

#### c. The Lack of a Fairness Opinion

Krieger contends that he is entitled to summary judgment regarding his allegation that Defendants failed to disclose that they did not obtain a fairness opinion. The Director Defendants argue that they are entitled to summary judgment on this claim because no fairness opinion was required.

Delaware courts have stated that corporate fairness opinions may assist corporate directors in fulfilling their fiduciary duties to minority stockholders by ensuring that the price offered in a cash-out merger is fair. However, such statements are generally made in the context of an "entire fairness" test, which this Court has already held would not be adopted by Michigan courts. In addition, Delaware courts do not require fairness opinions as a matter of law. *Smith v. Van Gorkom*, 488 A.2d 858, 859 (Del.1985). Therefore, the failure to disclose the lack of a fairness opinion was not a material omission.

#### d. Retention of McDonald & Co.

■ Krieger alleges that the Notice was misleading because it did not disclose "that McDonald & Co. had a continuing relationship with defendants, and RDV and its affiliates." (Am. Class Action Compl. ¶ 43D.) Under the facts presented to the Court, disclosure of Defendants' relationship with McDonald & Co. would not have been material to a shareholder's decision to seek appraisal. That information would not be material because the details of the transaction McDonald & Co. was retained to facilitate were fully set forth in the Notice. Whether shareholders were

---

**17.** It should also be noted that the MIBCA provides the means for a shareholder to obtain a corporation's balance sheet, income statement, and statement of source and appli-

cation of funds. *See* M.C.L. § 450.1487(1). Thus, a shareholder who considers financial information crucial to the decision to dissent may request and receive such information.

informed that McDonald & Co. had been retained would not add any significant information to the "total mix." The Court's conclusion might be different if Defendants had retained McDonald & Co. at the time of the Merger to conduct a future sale or IPO of Gast. However, the evidence shows that McDonald & Co.'s engagement ended once the 1996 recapitalization was completed. (Damstra Dep. at 210.)

### e. The Deloitte & Touche Valuation

 Krieger alleges that the Notice should have disclosed

that prior to the Merger, the accounting firm of DeLoitte & Touche was performing or had performed a multi-page valuation of Gast, or the methods used in such valuation. The non-disclosure [sic] the valuation was material since it demonstrates, *inter alia*, that DeLoitte & Touche improperly used $140 for the RDV sale as a benchmark, not $280, and DeLoitte & Touche included in its valuation of Gast a minority discount not permitted by law, the inclusion of which boosted the value of Gast far above the $140 being offered in the Merger.

(Am. Class Action Compl. ¶ 43F.) The Court concludes that Defendants are entitled to summary judgment on this allegation for several reasons. First, Defendants did not receive the Deloitte & Touche valuation until sometime after September 30, 1996, more than one month after the Merger occurred. (Ex. 61 at WG 0001246.) Although Krieger asserts that

Defendants say they relied on the Deloitte & Touche valuation, he cites no evidence to support this claim. Second, Deloitte & Touche was not retained to value Gast stock for purposes of the Merger and subsequent recapitalization. Instead, Warren Gast, his sister, and Westmaas hired Deloitte & Touche to value Gast stock in connection with charitable contributions those individuals either made or were planning to make. (W. Gast 10/20/00 Dep. at 84–85.) Warren Gast and his sister paid for the valuation. (*Id.* at 85.) Because the valuation was not prepared for company purposes, no disclosure was required. *See Camden v. Kaufman*, 240 Mich.App. 389, 398, 613 N.W.2d 335, 341 (2000)(stating, "plaintiff fails to cite any authority that would require defendant . . . to disclose to the shareholders . . . an evaluation prepared on his own behalf"). Finally, Deloitte & Touche valued the Class A non-voting shares and Class B shares at $136.50 per share and $137 per share, respectively. This valuation was increased from an initial conclusion of $103.76 and $109.22, respectively, by factoring in the negotiated $140 purchase price. The Deloitte & Touche valuation thus could not have affected a reasonable shareholder's decision to seek appraisal because it confirmed the $140 per share value determined by Defendants.[18]

### f. Determination of Merger Consideration

Krieger contends that the failure to disclose how the Merger consideration of

---

**18.** Krieger contends that Defendants were required to disclose the valuation because De loitte & Touche used an improper marketability discount. Krieger contends that a shareholder could have determined from the valuation that $140 was low based upon DeLoitte & Touche's use of a marketability discount. However, as Defendants point out in their brief, there is no clear consensus on whether or not a marketability or minority discount should be applied and specifically there is no Michigan authority on the issue. *See, e.g., Offenbecher v. Baron Servs., Inc.,* 2001 WL 527522, at *8, —— So.2d ——, —— (2001)(affirming use of marketability discount). Thus, according to Krieger's argument, Defendants were required to disclose the valuation after making a legal determination of whether the discount was proper. Krieger has not cited any authority to support such a duty.

$140 per share was determined renders the Notice misleading. As Krieger notes, Delaware courts have held that the basis upon which the merger price was determined is information that may be material to a shareholder's decision whether to seek an appraisal. *See Wacht v. Continental Hosts, Ltd.*, No. 7954, 1986 WL 4492, at *3 (Del.Ch. Apr. 11, 1986). However, the Court concludes that such information was not required to be included in the Notice because it is similar to financial information, which, under the MIBCA, must be furnished only after a shareholder makes the decision to dissent. Thus, as with financial information, there was no material omission in the Notice.

### g. Other Omissions

Krieger also contends that Defendants breached their fiduciary duties because they failed to disclose the five-year plan, which showed that Gast would have been worth more than $55 million after five years, even if the plan was not fully realized. The documents cited by Krieger do not support his claim. One of the documents, a discussion of financing alternatives dated September 28, 1995, by McDonald & Co., (Ex. 69), is based upon assumptions regarding transactions that never occurred and does not even mention the five-year plan. The other document, a March 25, 1996, memo from Nelson, (Ex. 88), describes two scenarios that never occurred and indicates that the net worth of Gast under either deal would be $7,426,000 and $3,426,000, not $55 million.

Krieger also contends that the Notice failed to disclose Defendants' conflict of interest. The Court rejects this argument because the Notice disclosed that the directors were GIC shareholders who would continue to be Gast shareholders after the Merger.

Finally, Krieger contends that the Notice was misleading because it stated that the RDV transaction was "anticipated" to occur when in fact it was certain to occur. The Court rejects this argument for the same reasons it concluded in the Issues Opinion that such a statement would not have been material. In addition, the capital restructuring agreement was not, in fact, executed until the month following the Merger, thus making the transaction "anticipated" at the time of the Merger. (Capital Restructuring Agreement, Vogel 3/9/01 Aff.App. A.)

### D. Are Krieger's Claims Barred By Gast's Articles Of Incorporation?

The Director Defendants contend that Krieger's claims are barred by a 1988 amendment to Gast's articles of incorporation limiting the personal liability of a corporate director for breaches of fiduciary duties. The amendment states that a director is not personally liable to the shareholder for a breach of the director's fiduciary duty, with relevant exceptions for: (i) breaches of the duty of loyalty; (ii) acts or omissions not in good faith or involving intentional misconduct or a knowing violation of the law; (iii) or a transaction from the director derived an improper personal benefit. (2/23/88 Certificate of Amendment to the Articles of Incorporation, 3/9/01 Westmaas Aff.App. F.) The limitation of liability provision was authorized by § 209(c) of the MIBCA, M.C.L. § 450.1209(c), which is in turn based upon § 102(b)(7) of Delaware's corporation code. Stephen H. Schulman, et al., *Michigan Corporation Law & Practice* § 5.10 (2001 supp.).

Although the Court has concluded that Krieger has failed to show that the Notice was misleading by reason of a material misstatement or omission, the Court concludes that the limitation of lia-

bility in Gast's articles provides an alternative basis for summary judgment to the Director Defendants. A director's disclosure violation may implicate either the duty of loyalty or the duty of care. *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 914 (Del.Ch.1999).

A claim for breach of the fiduciary duty of disclosure implicates only the duty of care when the factual basis for the alleged violation suggests that the violation was made as a result of a good faith, but nevertheless, erroneous judgment about the proper scope or content of the required disclosure. However, where a complaint alleges or pleads facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty.

*Id.* at 914–15. Thus, where a plaintiff's evidence fails to show that a disclosure violation amounted to a breach of the duty of loyalty or satisfied one of the other exceptions to liability, the directors will be shielded from liability. *See Arnold v. Soc'y for Savs. Bancorp, Inc.,* 650 A.2d 1270, 1288 (Del.1994). Moreover, liability is precluded regardless of whether the plaintiff's claim for monetary damages is based upon legal or equitable theories. *Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del.1996).

Based upon the record in this case, Krieger has failed to establish that if a material misstatement or omission occurred, it occurred as the result of bad faith or was knowingly or intentionally made. As discussed above, the centerpiece of Krieger's claims was a plan by Defendants to pay Krieger less than the fair value of his stock and appropriate the unrealized value of Krieger's and the minority's stock for Defendants in a subsequent transaction. The evidence fails to show that Defendants had such a plan or that they knowingly paid Krieger less than the fair value of his shares. Accordingly, the Director Defendants are shielded from personal liability under Gast's articles of incorporation.

### V. *Conclusion*

For the foregoing reasons, the Court will grant the Director Defendants' motion for summary judgment, deny Krieger's motion for summary judgment, and dismiss the case.

### *ORDER*

In accordance with the Opinion filed on this date,

**IT IS HEREBY ORDERED** the Director Defendants' Motion For Summary Judgment (docket no. 152) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's And The Class's Motion For Partial Summary Judgment (docket no. 140) is **DENIED.**

This case is **dismissed with prejudice.**